We'll begin with cause number 16-30933, United States of America v. Tracy Richardson Brown. Is the appellant ready to proceed? May it please the court. Your Honor, Mrs. Brown's lack of knowledge, her lack of understanding, her actual ignorance of the illicit scheme that she was convicted of runs like a red thread through the fabric of this case. I'm sure that the court has encountered situations where there is feigned ignorance. This is not one such case. Your Honor, this case was replete with indications that Mrs. Brown actually did not know about the illicit scheme that was taking place here. Justice Breyer I have a preliminary question about this sufficiency challenge you're bringing. Is it just to the conspiracy count? Because looking at your brief, page 32, the evidence was insufficient to support Brown's conviction for conspiracy to commit health care fraud. Then in your conclusion you say the court should reverse the conviction and enter judgment of acquittal as to that count, the health care fraud conspiracy. So does it just count one? Justice Breyer It's the entire conspiracy, Your Honor. All of the conspiracy counts with the sole... Justice Breyer There's only one health care fraud conspiracy count. Justice Breyer Well, everything in the conspiracy, with the exception of that part of the conspiracy dealing with the payments that were made that were improper. The payments made to the recruiters? Justice Breyer That's correct, Your Honor. That's the only part that we were excluding from that. But as I was indicating, there were just a number of indications here that this was an actual lack of knowledge type situation. First of all, I want to make it clear that there were no witnesses who ever testified that Mrs. Brown told them exactly what to do in terms of some kind of criminal behavior. That just did not happen. And it's almost inconceivable that you could have a multimillion dollar type enterprise where the yet the alleged ringleader of that conspiracy is saying nothing to the alleged conspirators about how to go about carrying out that... Justice Breyer She had about six marketers, is that right? Justice Breyer That's correct, Your Honor. Justice Breyer She hired the marketers. Justice Breyer She did hire them, and she believed that she could pay them a commission. She was a commission, and she actually brought that information to the attention of the authorities. Justice Breyer But there was at least a conversation when she hired them. Justice Breyer She did hire them, specifically telling them that I'm hiring you with the understanding that you're going to go out and get Medicare beneficiaries. But, Your Honor, that is insufficient by itself to indicate that she had a criminal mind at that point, that she had knowledge that they were going to actually go out and identify people who did not have a medical necessity for the durable medical equipment that was on prescription forms. Justice Breyer Well, I picked up in the brief that there was evidence that she knew that one of the marketers, Batiste, was filling out physician reports, filling them out and getting the doctors to sign or getting blank forms with his signature. Justice Breyer Well, Your Honor, you're correct about that 100 percent. She did know that Ms. Batiste was filling out the form, but it was her understanding, and she was correct, that Dr. Hunter was actually signing the form. So what that indicated to her is obviously that this is an authorized prescription, because even though Ms. Batiste is saying Dr. Hunter doesn't have the time to complete that form, I'm filling it out, Dr. Hunter is actually signing the form. And you could not look at the form itself and form any opinion about whether this was a fraudulent prescription or not. You simply could not do that on the basis of the form itself. Now, Ms. Batiste also had a romantic relationship with Dr. Hunter. She and Dr. Hunter had their own independent reasons for wanting to do something illegal. Now, that information was never brought to the attention of Mrs. Brown. She didn't know about that. There were just, as I've indicated, there were many, many indications here that she was not aware of what's going on and that she was, in fact, totally clueless about how these people were carrying out this thing. Even if you're right that there was evidence to support a finding that she didn't know, under the deferential standard of giving the jury's verdict, we have to uphold the verdict as long as there was also evidence from which they could have reached the opposite conclusion. So while you've got the kickbacks, which are themselves evidence of fraud also, because you normally wouldn't need to pay people to get patients, there were no co-pays, right? Medicare requires co-pays. The patient has to pay for their 20 percent because that indicates they really need these wheelchairs or other products. You had the arguments the government makes about the fact that they were basically ordering braces for a person's entire body, and you had the exorbitant profits that were being made on some of these brace devices, you know, where she was paying 20 bucks or something for them and billing hundreds and hundreds of dollars. So why, putting all that together, given the uphill battle you face given the jury verdict, why couldn't a jury conclude she knew? Well, Your Honor, I maintain that there were so many other indications that she did not know that it really counteracts some of the things that you're saying there. But this goes directly to this question of the deliberate ignorance jury instruction. That instruction was inappropriate because there was not substantial evidence of actual knowledge in this case, and there was virtually no evidence whatsoever that of a conscious effort on Mrs. Brown's part to avoid knowledge of what's going on. What about when the consultant came, and I think it was 2007, tells her there's all these problems, four or five things that you need to be doing differently, and then it goes on for at least another year without addressing any of those concerns? She did bring in a consultant, which in and of itself suggests to me that, and certainly I argue that to the jury, it suggests that she was doing what she could to find out how to improve the business. Now, she did get information from the consultant, but she handed that information over to someone else. Isn't that classic turning your eyes, not wanting to look at it yourself when you've been told there's all these red flags in your business? Well, Your Honor, at no time did the consultant say, well, look, Mrs. Brown, this is something that's unlawful, and if you continue to do this, you could get into trouble. She never said that. Mrs. Brown thought that she was doing the right thing by handing it to the people who were actually in a position in the company to do something about it, the people who actually handled the billing for the company. Didn't the consultant tell her that you'll be in trouble if you get audited? She made that clear. Mrs. Brown did what she could in terms of passing that information to the right people. Your Honor, this is not the everyday case. Mrs. Brown was not there. Now, I'm not saying that she should not have been there. She should have been at her business. But that is not criminal. That is negligence. That's lack of due care if she was not there doing the things carefully that she should have done. She should have done a lot of these things more carefully. There's no question about it. But she did not, and she fell short of the standard. Now, that is not a criminal standard. That is a standard for a civil matter. She also brought to the attention of the authorities things that were going on in the business. She talked about this Zanetta. It was another marketer, a lady who apparently forged the signatures of two doctors. Mrs. Brown actually conducted her own investigation and called in an attorney. That evidence was made known to the jury. It was made known to the court. Your Honor, that is — Didn't she do that only — I think in February of 2009, Medicare said, we're stopping payments. So she knows she's being looked at. And I think it was a few weeks after that that she said, oh, I've got this bad recruiter or marketer out here. Well, Mr. Sossam — Even though she knew — she knew before February of 2009 about this problem with this marketer, she knew, I think, in March of 2008 that this was going on. She brought this to the attention of some local authorities. And then she hired an attorney who actually wrote a letter to the Medicare authorities. And it was brought to their attention in 2009. But again, Your Honor, does, one, bring to the attention of people who are looking at your organization that kind of information? If you really want to hide all of these terrible things that are going on, she did not know about this. I guess it goes back to what I say about competing inferences. One inference is she didn't like what was going on. The other inference is because she waited a year to report this until she knew Medicare was on to her, that she was just doing this to try to get out of trouble only after she knew she was innocent. But, Judge, her cooperation with these inquiries and all predated that particular correspondence that you're talking about. She was always — every single witness who testified about whether she cooperated or not made it clear that she did cooperate and she was fully — she was forthcoming with all the information that they asked for. And again, I go back to the actual ignorance or the deliberate indifference charge. Your Honor, that charge was inappropriate because that kind of charge is only appropriate when there is substantial proof of actual knowledge. And there — even the government seems to suggest that perhaps even if there was not substantial proof of actual knowledge, there were some other things. Well, but that's the critical point. If you don't have substantial evidence of actual knowledge, then it's not the deliberate indifference instruction that applies in that case. You do not use that instruction where it's simply a question of competing inferences about whether there was actual knowledge or a person who was simply ignorant of what was going on or stupid. That's the language of the court cases. It talks about stupidity or ignorance versus actual knowledge. It does say that. And that just did not happen here. She didn't conceal information. She didn't fabricate information. Those are the kind of things that one would normally expect of someone who is aware that he or she is engaged in criminal activity. They're going to do that kind of activity. They're going to conceal. They're going to fabricate. As I indicated, Mrs. Brown volunteered information. Now, also, the marketers went out of their way to make it clear or at least not to raise any red flags to Mrs. Brown. They could have done the things that they did right there on the premises of Psalms 23. Not one of them did that kind of thing. Not one of them brought the doctors in. Not one of them made a disclosure to Mrs. Brown or someone working for Mrs. Brown. You know, these are all bogus prescriptions. The doctors are just signing anything that we put in front of them. They never, ever said that kind of thing. And they could have brought their paperwork to the premises of the business, and they could have filled out that paperwork right there in her presence, and they could have signed the doctor's signatures. The very fact that they went and got a doctor's signature, even though the doctors were all in on this, they went through the motions of making it appear that they had a valid prescription. Mrs. Brown didn't know that the doctors and the doctors were working together to give the appearance that this was a valid prescription. If this was simply just a massive scheme involving Mrs. Brown as the ring leader, the court will note that I did object to the four-point enhancement for being an organizer. It's noted. Counsel, your time has expired, so I'll give you a moment to conclude. Your Honor, I would indicate to the court that this is not the kind of ordinary case that you have where a person involved in a health care fraud scheme is simply directing and organizing orchestrating the activities. This is something where a person who actually had no knowledge of what was going on was in a position where things were going on without her knowledge, and they inured to the benefit of the company, but it's not criminal activity. All right. Thank you, Mr. Jordan. When you get back up for rebuttal, here's what I'd like you to consider, because what you've done is you've made a very compelling argument, except my assumption is that the jury heard that argument and they convicted her. Isn't that right? Yes, Your Honor. All right. I'll give you a chance to address that when you come back on rebuttal. Yes, sir. May it please the court. William Glasser for the United States. The critical thing to consider in this case is the deferential standard of review that applies to the jury's verdict. This court is not even considering this case under the Jackson v. Virginia standard, which is itself very deferential, but under the manifest miscarriage of justice standard that this court has applied in cases where the defendant has not preserved an objection to the sufficiency of the evidence. This court has said that that standard is only met where the record is either devoid of evidence or the evidence on an essential element is so tenuous that a conviction is shocking. In this case, Ms. Brown cannot show that the evidence was so lacking with respect to her intent that she could not be convicted of the health care conspiracies or the underlying substantive counts, which I think there's some confusion as to whether those are challenged, but the government's position is that the evidence was sufficient with respect to all of them. The evidence of her knowledge turns on a number of things, but I think the most important thing is the visit from the consultant in fall of 2007. Ms. Falls came to the Solomons 23, Ms. Brown's company, and specifically told her a number of problems with the way that the company was doing business. She said that you're not allowed to pay for referrals, you're not allowed to waive co-pays, you need to have an occupational or physical therapist to make sure that these things that might be prescribed by a doctor actually fit the beneficiary. She pointed out that one beneficiary, for example, had received both a power wheelchair and braces for his entire body. She pointed out that Solomons 23 was billing for bilateral braces, that is braces for both sides of the body, when the prescriptions that were signed by these dirty doctors only called for braces on one side of the body. She pointed out to Ms. Brown that there is no such thing as an arthritis kit, the Medicare doesn't recognize that, and she pointed out, she actually showed Ms. Brown on the computer, that Solomons 23 was only billing for the most expensive coats. There was never, there were never cheaper braces or cheaper wheelchairs that were given to the other evidence in this case, and the other evidence is substantial. For example, ordinarily one would not need to pay a doctor for prescriptions, as was the case with Dr. Kirkpatrick. One certainly wouldn't need to pay the doctor's mother, as was the case with Dr. Kirkpatrick. But regardless of all that other evidence, Ms. Brown was put on notice upon Ms. Fall's visit in fall 2007 that she was billing Medicare inappropriately. Did she make any changes after the visit with the consultant? No, your honor, and in fact all of the counts, the substantive counts charged in this case, came after that visit, more than a year after that visit. So even more than a year after that visit, in fall of 2008 through the spring of 2009, Mrs. Brown's business continued to bill Medicare for these inappropriate items. So the evidence in this case was more than sufficient under the Jackson standard, but certainly even if this court considered it a close case, it wouldn't meet the manifest miscarriage of justice. But you're conceding that none of the marketers testified that they told her anything about their illegal activity? That's correct, your honor. It was none of them, those that testified did not say, we specifically talked about how this was illegal. However, Ms. Batiste did tell Ms. Brown that she was having her fiancé sign, her fiancé Dr. Hunter, sign the prescriptions because he was too lazy to do them himself. So she was filling them out, she was also filling out these progress reports, which Medicare requires, and she was just having Dr. Hunter sign them because she said he was too lazy to do them himself and she told that to Ms. Brown. So certainly there was, even if she wasn't told by these marketers that they were engaging in illegal conduct, the jury could infer that Ms. Brown knew from the statements that were made. Were some of the recruiters charged? Yes, your honor. Many of these recruiters have actually pleaded guilty in other cases. One of them, Ms. Thompson, was actually charged as a co-defendant in this case, and this court recently concluded that those charges didn't violate double jeopardy. So she's going to most likely be having a trial if she doesn't plead guilty. But the government didn't get any favorable testimony from any of the recruiters? Your honor, favorable testimony, yes. They testified to what they were doing and they testified about these conversations that they had with Ms. Brown, but there wasn't any testimony that we specifically said fraud. They didn't testify that we both had this understanding that we were violating the law, but they did testify that Ms. Brown was aware of what they were doing. Aware of what they were doing, what do you mean? Aware that they were obtaining these prescriptions from either from doctors or, in the case of Dr. Kirkpatrick, that she was writing these direct testimonies that we discussed fraud, Ms. Brown was aware that these recruiters were using their own doctors to obtain these prescriptions. And from the face of the prescriptions themselves, from the fact that Psalms 23 was billing for things that weren't even included in the prescriptions, the jury could infer that Ms. Brown had knowledge that the recruiters were committing fraud. For example, another one of the recruiters, Ms. Temple, she actually would contact Psalms 23 to make sure that a beneficiary had Medicare Part B before she actually went out with her doctor, Dr. Cottles, to quote-unquote write them up. So she would actually, it was clear to Ms. Brown that Ms. Temple was only generating these prescriptions in order to bill Medicare and not because of some medical necessity. Your brief says in strong terms that Medicare doesn't pay for these full arthritic kits that the company was billing for. I know that's how eventually the company came under scrutiny, but if it's not a permissible charge under Medicare, why was it being paid for all those years? Your Honor, my understanding is that this was something that Medicare sort of realized around the end of 2008, where they started to see consistently all of these braces being paid. The individual braces are things that Medicare will Is it billed together or just individually? Your Honor, they were billed individually, so you would put in a code for each one of them, but Medicare realized that all of these codes were being used in conjunction, and so these cases cropped up all across the country around that time. So does now the computer system have something that'll flag when all these are getting billed for the same beneficiary? Your Honor, my understanding is that's how it's supposed to work, and there's constant auditing on the part of Medicare. They actually hire contractors to look for patterns of billing that raise suspicion, and in this case, that's exactly what happened and how they discovered the fraud. One other question about Medicare procedures. The amount that Medicare allows to be billed for these wheelchairs must build in quite a bit of profit because, first of all, it assumes 20% is going to be paid by the beneficiary. Yes, Your Honor. Ms. Brown wasn't getting that 20%, so she was only getting 80% of the price that Medicare recognizes. She was also paying out, I think, $500 for those to her recruiters, so without the 20%, paying $500, she was still making a good bit of money. I mean, there must be a really high profit built into that. Your Honor, I don't know what the underlying cost to her was of the wheelchairs, but in her case specifically, she was billing not only for the wheelchairs but also for many accessories, so sometimes there was testimony from Mr. Berge that sometimes with accessories, these things could bill up to $10,000. Ordinarily, the wheelchair itself is only $5,000, but the high profit margin is a significant problem and the reason that, again, there are many, many Medicare fraud cases around the country that have involved power wheelchairs, and I can't speak on behalf of Medicare, but I would hope that there is a continued effort to rein this in. If the Court has no further questions on the other issues raised, I'm happy to yield my rebuttal. Your Honors, I believe that the government has come very close to the point of saying that there was no direct evidence of actual knowledge, and that, again, is one of the key points that we make in our brief, that in the absence of substantial proof of actual knowledge, the deliberate indifference instruction is inappropriate. I'm confused on that because I thought the deliberate ignorance instruction we say should be given when it's not an actual knowledge case, when there's all this indicia of wrongdoing and you blind your eyes. Don't the the substantial evidence of actual knowledge that given the instruction is harmless then? There must be an absence of actual knowledge and also conscious efforts on the part of the defendant to not know what's going on, and there are not indications of substantial conscious efforts on the part of Mrs. Brown to not understand or not know what's going on. I understand that the Court is looking at the fact that the consultant came in and Mrs. Bacon came in, Ms. Twyla Bacon. That information was taken. It was absorbed to the extent that Mrs. Brown knew that the billing practices should conform to those instructions. In connection with the consultant, was she advised by the government that she should have a consultant come in and look at her operations? No, that's the next point. The decision to do that was hers alone. That's exactly right. She decided to do that. She didn't have to do that when she looked for certification. She also brought someone in to help her with that. Again, those are signs of not engaging in a conscious effort to avoid knowing about something. Certainly that's the kind of behavior that one would expect of someone who wants to go to the consultant. The government just said that after the consultant came in and said, look, you can't pay recruiters commissions. You're billing for the most expensive equipment. That's going to waive flags. She just kept right on doing it. Your Honor, I think that that commission point was brought to the attention of the person who said that's the only way that you can pay the marketers by salary and not by commission. I think that Mrs. Brown had a confusion about whether there was some kind of safe haven of some sort. Don't you think the jury could look at that with a scant thought that she didn't know that after the consultant talked to her? I do understand the court's position on that, but I think the district court was also in a position to say that based upon everything that I've heard in this case, there is not direct evidence of actual knowledge and a conscious effort on the part of Mrs. Brown to avoid knowledge of what's going on. We know she claimed that she didn't have knowledge. That part of it is clear. She was claiming she had no knowledge of what was going on. There certainly are suspicious circumstances and circumstantial evidence that she did have knowledge. I don't understand why that's not exactly what this instruction is designed for. Your Honor, I think that the ordinary instruction about knowledge and so on was the appropriate one here, rather than the deliberate indifference type instruction. The deliberate indifference instruction is reserved for those special cases. That's my understanding of the Fifth Circuit's rulings on these matters. I agree the case should be rarely given, but if we apply the harmless error analysis, what was the prejudice? Why was this instruction so harmful to her defense? I think it directly plays into the government's argument that she really was a person with the actual intent to organize and orchestrate this whole scheme. It really gives the government an unfair advantage in presenting the case to the jury. That's exactly what ended up happening. I think it makes it more likely that the jury would find that Mrs. Brown did all the things that the government claims that she did. Thank you, counsel. Thank you, Your Honor.